IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DUSTIN BRUNTON, | ) | Case No. 5:20-CV-2233 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

## I.  Introduction

Plaintiff, Dustin Brunton, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Brunton challenges the Administrative Law Judge's ("ALJ") negative findings on his application, contending that the ALJ: (1) misevaluated the medical evidence in determining whether he met or medically equaled a medical listing; (2) failed to apply the proper standards in considering his need for an assistive device limitation; (3) misevaluated the opinion evidence, and (4) failed to properly question the vocational expert ("VE").  Further, Brunton contends that the statute under which the Commissioner of the Social Security Administration ("SSA") serves is unconstitutional because it violates the principle of separation of powers.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

Because Brunton has not suffered a particularized injury stemming from the asserted separation of powers violation, he lacks standing to use the allegedly unconstitutional limitation on the president's power to remove the Commissioner as a basis for remand.  Further, because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Brunton's applications for DIB and SSI be affirmed.

## II.    Procedural History

On March 8, 2018, Brunton applied for DIB and SSI.  (Tr. 220-221).[2]  Brunton alleged that he became disabled on February 23, 2018 due to: (1) morbid obesity; (2) lymphedema; (3) neuropathy; (4) venous stasis ulcer; (5) asthma; (6) obstructive sleep apnea; (7) high blood pressure; (8) depression; (9) post-traumatic stress syndrome ("PTSD"); and (10) attention deficit hyperactivity disorder ("ADHD").  (Tr. 245, 248).  The Social Security Administration ("SSA") denied Brunton's application initially and upon reconsideration.  (Tr. 92-106, 141-157).  He requested an administrative hearing.  (Tr. 175-176).

ALJ Michael Schmitz held a hearing on September 18, 2019 and denied the claims in a November 14, 2019 decision.  (Tr. 12-46).  In doing so, the ALJ determined at Step Three of the sequential evaluation process that Brunton did not have an impairment that met or equaled Listings 1.02A (major dysfunctions of a joint), 4.11 (chronic venous insufficiency), 12.04 (depressive and related disorders), 12.06 (anxiety), 12.11 (neurodevelopmental disorders), and 12.15 (trauma and stressor-related disorders).  (Tr. 18-19).  At Step Four of the sequential evaluation process, the ALJ determined that Brunton had the residual functional capacity ("RFC") to perform sedentary work, expect that:

---

[2] The administrative transcript appears in ECF Doc. 12.

> [Brunton] can occasionally push, pull, and operate foot controls with the
> bilateral lower extremities and it limited in the following nonexertional
> respects: [1] Can never climb ladders, ropes, or scaffolds but can occasionally
> climb ramps and stairs; can occasionally stoop, kneel, crouch, and crawl; and
> can frequently balance; [2] Must avoid concentrated exposure to extreme cold,
> extreme heat, humidity, and fumes, odors, dusts, gases, and poor ventilation;
> and must avoid all exposure to hazards such as unprotected heights, moving
> mechanical parts and the operation of motor vehicles; and [3] Can perform
> simple, routine, and repetitive tasks but cannot perform tasks at a high
> production-rate pace (such as assembly-line work), can make only simple work
> related decisions, and should not be responsible for the safety or welfare of
> others; can interact on an occasional basis with supervisors and with a small
> group of familiar coworkers, but can have no more than incidental interaction
> with the general public, and is limited to superficial contact, meaning no sales,
> arbitration, negotiation, conflict resolution or confrontation, no group, tandem
> or collaborative tasks, no management, direction, or persuasion of others; and
> can respond appropriately to occasional change in routine and relatively statis
> work setting, where any such changes are easily explained and/or demonstrated
> in advance of gradual implementation.

(Tr. 22-23).

Based on VE testimony that a hypothetical individual with Brunton's age, experience,

and RFC could work in such available occupations as addresser; document preparer; and

"Touch-up Screener, Printed Circuit Board Assembly;" the ALJ determined that Brunton wasn't

disabled because he could perform a significant number of jobs in the national economy.

(Tr. 42-46).  On July 31, 2020, the Appeals Council denied further review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 1-3).  On October 2, 2020, Brunton filed a

complaint to obtain judicial review.  ECF Doc. 1.

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Brunton was born on October 14, 1982 and was 35 years old on his alleged onset date. (Tr. 245).  He graduated from high school and completed three years of college.  (Tr. 249).  He had previously worked in various positions as technical or computer support.  *Id.*

#### B.    Relevant Medical Evidence

##### 1.    Medical Evidence of Physical Health

On February 3, 2018, Brunton saw Chandra Lynch, PA, for a wound and circulation issues in his legs.  (Tr. 354).  He reported having a small open wound on his left leg for several days, which was initially open but had since scabbed over.  *Id.*  He was noted as having "active problems," including: (1) asthma, (2) ADHD, (3) morbid obesity, (4) anxiety, (5) lymphedema, (6) cardiomegaly, and (7) type 2 diabetes.  (Tr. 345-355).  On physical examination, PA Lynch found that Brunton had a "2+ pitting" edema on his lower left leg and a dry open wound with surrounding erythema.  (Tr. 354).  She assessed Brunton with cellulitis on his left leg.  *Id.*

On February 27, 2018, Brunton saw Bradley Crombie, MD.  (Tr. 351).  Brunton reported that he had pain in his left leg after hitting it against a cloth couch and painful lesions.  *Id.*  On physical examination, Dr. Crombie found that Brunton's left lower leg had two small scab-like lesions, no erythema, and that the chronic changes were consistent with chronic venous insufficiency.  (Tr. 353).  Dr. Crombie assessed Brunton with varicose veins in his left lower leg and a non-pressure chronic ulcer of his left calf.  *Id.*  He referred Brunton to wound care.  *Id.*

On February 28, 2018, Brunton was seen at Summa Health by Rick Asper, DMP, complaining of an ulcer with an edema on his left ankle.  (Tr. 330).  He reported experiencing dull pain, which was about a four out of ten.  *Id.*  In a review of his symptoms and medical

4

history, Brunton was found to have polycythemia, diminished pulses on both sides due to edema, chronic lymphedema on both sides, and his gait and station were unexceptional for his age. (Tr. 331-332).  Regarding his wounds, Asper observed that the wound on his right calf was open and caused by a venous leg ulcer and the wound on his left calf was open and caused by vasculopathy and vasculitis.  (Tr. 332).  Asper instructed Brunton on dressing his wounds and to elevate his legs and avoid standing for long periods of time.  (Tr. 333-334).

On March 12, 2018, Brunton returned to Summa Health, complaining of ulcers and venous insufficiency on both legs.  (Tr. 335).  It was reported that his wounds had healed, and he was again instructed on caring for his edema by elevating his legs.  (Tr. 335-336).  He was also noted as refusing to wear compression garments because he was claustrophobic.  (Tr. 336).

On March 20, 2018, Brunton saw Dr. Crombie, and it was noted that Brunton's wife had previously called and reported that he was in severe pain, having a corkscrew-like twisting in his leg, and had difficulty sitting, standing, and walking.  (Tr. 348).  On physical examination, Dr. Crombie observed that Brunton had no signs of cellulitis and his left leg seemed to be healing, but he had significant venous insufficiency in his lower legs; a "2+ pitting" edema; and significant pain, discomfort, and swelling on his left ankle area.  (Tr. 349).  He also had significant pain to palpation in the upper anterior lateral aspect of the ankle/lower part of the leg. *Id.*  Dr. Crombie assessed Brunton with lymphedema, left leg pain, a non-pressure chronic ulcer of his left calf, obesity, and type 2 diabetes.  *Id.*

On March 27, 2018, Brunton followed-up with Dr. Crombie and his examination notes and assessment of Brunton were the same, but Brunton reported that his pain medication was working.  (Tr. 354-347).

On March 30, 2018, Brunton saw Jeffery Junko, MD, complaining of pain and swelling in his left ankle, which increased throughout the day.  (Tr. 390).  On physical examination, Dr. Junko observed that Brunton had a large amount of lymphedema in both his legs, and his left leg had diffused ankle swelling, "2+" pulses, intact sensation, normal reflexes, and 5/5 muscle strength.  (Tr. 392-393).  He also observed that Brunton had tenderness to palpation in the anterior ankle, was able to walk with a mild limp, and was able to stand unassisted and maintain his balance.  (Tr. 393).  Dr. Junko assessed Brunton with arthritis in his left ankle and discussed treatment options, noting that he was a poor surgical candidate because of the amount of lymphedema he had.  (Tr. 396-397).

On March 30, 2018, Brunton also had an x-ray of his left ankle.  (Tr. 398).  It indicated that he had a 0.9 cm subarticular cyst-like lucency with sclerotic margin at the distal tibia; no acute facture, dislocation, or periosteal reaction; and a small calcaneal spur.  (Tr. 399).

From May 15, 2018 to April 30, 2019, Brunton saw Dr. Crombie about once a month. (Tr. 414, 419, 447, 453, 456, 459, 473, 477, 484).  Initially, Brunton complained of arthritis in his hips, and pain in his left foot and ankle.  (Tr. 414, 419).  He reported using CBD oil for his ankle pain, which he later said was improving, and, on physical examination, Dr. Crombie found that Brunton had chronic venous insufficiency in his ankle and trace bilateral edema only. (Tr. 414, 419-420).  On one occasion, Brunton reported that he could do yard work for two hours; mow the lawn, which took about an hour; his hip flexor muscle was spasming; and he was having trouble getting in his car.  (Tr. 414).  Dr. Crombie assessed him with a strained hip muscle, lymphedema, obesity, and pain in his left foot and ankle.  (Tr. 415-416, 421).  He did not prescribe any pain medication for Brunton's ankle.  (Tr. 416, 421).

On August 29, 2018, Brunton began complaining of swelling and pain in his left ankle and lower legs.  (Tr. 447).  On examination, Dr. Crombie noted that Brunton was then 424 pounds, after having lost 70 pounds since February 2018, and he had severe swelling in both lower legs, which was worse on the left; a swollen left ankle; and multiple varicosities in his feet and ankles.  (Tr. 448).  He also noted that Brunton's lower leg was shaped like an inverted wine bottle, there was an edema on Brunton's left leg, and the skin on his right leg was soft.  *Id.* Dr. Crombie assessed that Brunton had stage III lymphedema on his left leg and stage II on his right leg, noting that his diabetes, history of deep vein thrombosis, and evolving symptoms of lymphedema could hinder his recovery.  *Id.*  Dr. Crombie opined that Brunton should seek skilled physical therapy in conjunction with home exercise to address the problems. (Tr. 448-449).  At one subsequent appointment, Brunton reported not having worn compression garments.  (Tr. 453).  Later, however, Brunton reported losing 85 pounds over the prior 6 to 7 months and noted it was easier to get his compression garments on, and Dr. Crombie found that there was "good reduction" in his edemas and both legs.  (Tr. 456-457).  He recommended continued treatment with compression, exercise, and manual lymphatic drainage.  (Tr. 457).

On October 19, 2018, Brunton saw Dr. Crombie and reported that he was still losing weight and would walk his half-acre yard.  (Tr. 473).  He also recounted suffering from severe concussions in school and underwent magnetic resonance imaging ("MRI"), which was unremarkable.  (Tr. 473, 500-501).

On December 11, 2018, Brunton saw Dr. Crombie for the discharge from the therapy program.  (Tr. 459).  Dr. Crombie noted that he had made progress from therapy and home exercise and had a good reduction of his edema in both legs.  (Tr. 460).

On January 24, 2019, Brunton returned to Dr. Crombie.  (Tr. 477).  He reported continued weight loss and that his edema had improved, and he was only taking his mental health medication and medical marijuana.  *Id.*  His physical examination results were generally the same as before, with his one edema being "one plus pitting."  (Tr. 479).  Dr. Crombie did not change his assessed conditions.  (Tr. 479-480).  By April 30, 2019, Brunton reported to Dr. Crombie that he was "able to walk on his left foot with minimal problems," but had fallen and was experiencing left ankle pain.  (Tr. 484-486).

On May 20, 2019, Brunton saw Dr. Junko.  (Tr. 518).  He reported foot and ankle pain resulting from a fall about a month prior.  (Tr. 518-519).  In reviewing his symptoms, Brunton reported that he had issues with diabetes, circulation, and high blood pressure.  (Tr. 519).  He did not report any other problems.  (Tr. 519-520).  On physical examination, Dr. Junko noted that Brunton's left leg had no lymphedema but had "chronic lymphedema of the calf and leg extending to the level of the ankle," "2+" pulses on his limbs, intact sensation, and normal reflexes.  (Tr. 522).  He also had 5/5 muscle strength in his left leg and was tender to palpation along the anterior medial and lateral aspects of the ankle joint.  (Tr. 522-523).  Brunton could walk with an antalgic gait, was able to stand unassisted, and maintained his balance.  (Tr. 523).  Dr. Junko reviewed Brunton's x-ray and identified a cyst on Brunton's tibia, arthrosis in his ankle, and soft tissue swelling diffusely at the level of the ankle.  (Tr. 523).  Dr. Junko assessed him with ankle pain and recommended an MRI.  (Tr. 525).

On June 10, 2019, Brunton had an MRI study of his left ankle.  (Tr. 502).  On June 17, 2019, Brunton again saw Dr. Junko.  (Tr. 527).  On his left leg, Dr. Junko found that Brunton had no signs of lymphedema, "2+" pulses on his left leg, intact sensation, and good reflexes.  (Tr. 531).  Brunton also had 5/5 muscle strength in left leg, tenderness on palpation around his

ankle, could ambulate with an antalgic gait, and was able to stand unassisted and maintain his balance.  (Tr. 531-532).  Dr. Junko reviewed Brunton's MRI, finding that Brunton had a large cyst and arthrosis in his ankle.  (Tr. 532-533).  He assessed Brunton with significant ankle arthrosis and that in his opinion only a fusion procedure would be beneficial, but he did not recommend the procedure because of Brunton's young age.  (Tr. 533).  Brunton wanted to try a walking aid, such as a cane, which Dr. Junko prescribed.  *Id.*

### 2.      Medical Evidence of Mental Health

On October 11, 2019, Brunton saw Anil Parikh, MD, DFAPA, for psychiatric treatment.
(Tr. 462).  Brunton reported having had depression and anxiety for years and undergoing a number of psychological stressors.  *Id.*  He also reported having insomnia, increased appetite and weight gain, low energy, low motivation, nervousness, anxiety, poor concentration, irritability, guilt, and social isolation and withdrawal.  *Id.*  Dr. Parikh also noted that Brunton had had suicidal ideations in the past, but had no history of suicide attempts, and had a number of symptoms suggestive of mania, but it was "difficult to say" whether they were genuine or related to his marijuana usage or personality issues.  *Id.*  Dr. Parikh also noted that there was no history suggestive of psychotic disorder, obsessive compulsive disorder, eating disorder, or PTSD.  *Id.*
Dr. Parikh's impression as that Brunton had major depressive disorder, recurrent; panic disorder; generalized anxiety disorder; and marijuana dependence.  (Tr. 463).

From October 18, 2018 to February 13, 2019, Brunton had five counseling sessions with Dr. Parikh's practice.  (Tr. 464-468).  Throughout, he was generally observed as being cooperative; and having good eye contact, coherent and relevant speech; stable or euthymic mood; appropriate or congruent in affect; normal thought content, intact or normal thought processes; fair concentration, attention, memory, judgment, and insight.  (Tr. 464-468).  He

generally reported that his medication was helping, and he was not experiencing any side-effects. (Tr. 464-465, 468).  During various sessions, he noted that he was chiefly troubled by anxiety and depression, although in one session he reported feeling nervous, irritable, depressed, fatigued, and anxious.  (Tr. 465-467).

On May 13, 2019, Brunton underwent an intake evaluation for Portage Path Behavior Health ("PPBH").  (Tr. 544).  He reported that he was having functional difficulties associated with depression, anxiety/mood swings, PTSD, ADHD, obsessive compulsive disorder, and his finances.  *Id.*  He stated that his symptoms included anger, daily sadness, decreased sleep, fatigue, inattention, mood swings, nervousness, obsessive-compulsive, panic attacks, and poor concentration.  *Id.*  He also identified various symptoms specifically connected to depression, mania/hypomania, anxiety, and panic attacks.  (Tr. 544-545).

The evaluation identified that Brunton had previously experienced trauma, noting that as a four-years-old, Brunton had witnessed his mother be nearly beaten to death by her ex-boyfriend; he had experienced people trespassing and living on his property; he had heard the gunshots associated with various deaths; and his stepmother was physically aggressive and caused him to fear for his life.  (Tr. 546).  Brunton also reported PTSD symptoms including nightmares, intrusive memories, flashbacks, hypervigilance, exaggerated startle response, and avoidance of reminders of the trauma.  *Id.*  He used marijuana, at his peak using it three times a day; had used it that day; and reported having a prescription for it.  (Tr. 546-547).  Brunton also reported a history of being verbally and physically aggressive with his wife.  (Tr. 548).

On examination, Brunton was noted as being unremarkable in his activity, eye contact, grooming, hygiene, and speech.  (Tr. 550).  He was reported to have impaired cognition in his attention and concentration, but no delusions or hallucinations.  *Id.*  He was appropriate in affect,

cooperative, anxious, depressed, and irritable.  *Id.*  He also had fair insight, fair judgment, and racing and tangential thoughts.  *Id.*  Brunton was assessed to have the criteria for major depressive disorder and rule-out diagnoses for unspecified bipolar and related disorder.  *Id.*  He also met the criteria for generalized anxiety disorder with panic attacks.  *Id.*

On May 28, 2019, Brunton saw a therapist at PPBH.  (Tr. 554).  He reiterated his social and medical history and added that he had been physically and sexually abused by neighborhood boys as a child.  (Tr. 555).  He indicated that he had a "horrible work history" because he never got along with people or had a job longer than a few months.  *Id.*  On examination, Brunton had average activity and eye contact, rapid speech, a logical thought process, and tangential thought associations.  (Tr. 557).  He was orientated and had normal and intact thought content; normal and intact perceptions; poor insight; fair judgment; normal and intact memory; and good attention and concentration with minimal distractibility.  (Tr. 558).  He was able to name objects and repeat phrases, and had good fund of knowledge, inappropriate laughter, moderate anger and anxiety, mild depression and euphoria.  *Id.*

On May 28, 2019, Brunton underwent another evaluation at PPBH with licensed independent social worker Lisa Renier, LISW-S.  (Tr. 563).  His reported symptoms largely related to his pain, had dreams that cause him to be agitated, and would be irritated by something small.  *Id.*  He was observed to have slowed activity; unremarkable eye contact, grooming, and hygiene; and unremarkable but rapid speech.  *Id.*  He was noted as having a cognitive impairment in his attention and concentration; a labile affect; cooperative; an anxious and depressed mood; fair insight and judgment; and logical, racing thoughts.  *Id.*

On June 4, 2019, Brunton met with Renier.  (Tr. 569).  Brunton described more of his family history, how he struggled to make friends, had a hard time releasing anger, and was

concerned with safety.  *Id*.  She observed that he was still impaired in his attention and concentration; was anxious and cooperative; and had a labile affect, fair insight and judgment, and racing thoughts.  *Id.*

On June 11, 2019, Brunton again met with Renier.  (Tr. 566).  He described how he and his wife had argued, how he felt his moods kept "cycling" between being happy and sad, how he felt that he did not deserve to be happy, and what increased his anxiety.  *Id.*  Renier reported that Brunton was impaired in his attention/concentration and had paranoia.  *Id.*  She also observed that he was appropriate and labile in affect; cooperative; anxious; had fair insight and judgment; and logical, racing thoughts.  *Id*.

From June 25 to July 25, 2019, Brunton met with Renier three times and a different counselor once.  (Tr. 572, 577, 597, 601).  Their observations of his affect, mood, and mental status generally remained the same as those identified above.  (*See* Tr. 572, 578-579, 597, 601).  He reported various symptoms including hypervigilance, depression, hopelessness, instance of high energy and impulsiveness, and disorganization and confusion, and denied suicidal or homicidal ideations.  (Tr. 572, 577-578, 598-599, 601).  During one session, Brunton explained that his family had taken a trip to Wisconsin and he had "had a nice time" and "it went better than he had anticipated."  (Tr. 598-599).

### C.    Relevant Opinion Evidence

#### 1.    Lisa Brunton's Function Report

On September 10, 2019, Brunton's wife, Lisa, completed a function report on Brunton's limitations.  (Tr. 291-298).  She reported that Brunton had extreme pain in his legs, ankles, and hips; he could not walk without being in pain; and he experienced "mental and emotional issues/pain."  (Tr. 291).  She noted that he also fluctuated between mania and depression.  *Id.*

Brunton's average day consisted of lying on the couch, going outside the front door to smoke, and maybe sitting at the table before again lying down.  (Tr. 292).  She indicated that he did not eat unless someone was home.  *Id.*  He watched their four-year-old child for short periods.  *Id.*

Prior to his conditions, Brunton could travel, sit, work, would cook, and would attend the children's school functions.  *Id.*  His conditions affected his sleep, causing him to wake up with pain after two to three hours, and had taken an emotional toll.  *Id.*  He also had pain in bending and moving his legs and hips to get dressed and could not soak in a tub because of his legs.  *Id.* He did not need to be reminded to take care of his personal needs, but she would remind him to take his nighttime medication if she did not see him take it.  (Tr. 293).  He did not make his own meals, as he could not stand long enough to cook but would rewarm leftovers.  *Id.*  He did not do any house or yard work due to the pain in his legs.  (Tr. 293-294).  He only went outside to smoke cigarettes.  (Tr. 294).  When he left the house, he could drive or ride in a car, usually for very short distances, and could go out alone.  *Id.*  He did not go shopping and, she took care of their finances but did not know if he could.  *Id.*  She reported that he watched videos, read articles on his phone, and listened to music most of the time.  (Tr. 295).  He no longer played the guitar or piano or with their children.  *Id.*

Brunton talked to his mother and a "handful" of other friends and relatives a couple of hours a day.  *Id.*  He did not go anywhere on a regular basis because of his social anxiety and nervousness.  *Id.*  He had problems getting along with his family and friends due to his bipolar and anxiety and had PTSD from his childhood.  (Tr. 296).  She indicated that he stayed home most of the time and very few people came over.  *Id.*  His conditions also affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember things, complete tasks, concentrate, understand things, follow instructions, and get along with others.  *Id.*  His

13

movements were very impaired.  *Id.*  She estimated that he could walk a couple of blocks but

was in pain, he could only pay attention for five to ten minutes, and he could not finish what he

started.  *Id.*  Because of his short attention span, he would not finish watching a 30-minute

television show.  *Id.*  She constantly reminded him of things.  *Id.*  He did not have any trouble

with authority, he had not been fired to laid off of because of trouble working with others, but he

did not handle stress well because of his anxiety, panic attacks, and anger.  (Tr. 297).  She did

not note any assistive devices prescribed by a doctor.  *Id.*  She also reported that he had had to

travel to Wisconsin alone with her children because Brunton could not sit in the car for that

period of time.  (Tr. 298).

### 2. Psychological Consultant Examiner – Cheryl Benson-Blankenship, Ph.D.

On May 1, 2018, Cheryl Benson-Blankenship, PhD, evaluated Brunton's mental health.

(Tr. 403-408).  She noted that Brunton used a cane for support when walking.  (Tr. 403).

Brunton explained that he had major neuropathy and reported that he stopped working due to

medical issues.  *Id.*  He also reported developing depression concurrent with his medical issues.

*Id.*  He explained that he had been diagnosed with ADHD as a child and had PTSD from

childhood abuse.  (Tr. 404).

Dr. Benson-Blankenship observed that Brunton was cooperative and had a somewhat

depressed mood; normal thought content; had coherent, logical, and organized thought

processes; and was orientated to person, place, time, and situation.  (Tr. 405).  When evaluating

his memory, Dr. Benson-Blankenship noted that he could initially remember three words when

asked to repeat them backwards but after five minutes forgot one and when asked to repeat a

series of numbers, he could repeat them forwards but inverted two numbers when doing so

backwards.  *Id.*  Otherwise, she found that he had a general fund of knowledge, was able to

14

complete the tasks for evaluating his concentration and abstract thinking and had fair insight into his condition.  (Tr. 405-406).  Functionally, Dr. Benson-Blankenship noted that Brunton reported being in chronic pain, that his wife would sometimes assist him with his self-care, he spoke with friends on a daily basis, he used his phone to watch movies and listen to music but did not read to watch movies on television, and he had a poor stress tolerance.  (Tr. 406).

Dr. Benson-Blankenship diagnosed him with major depressive disorder, recurrent, moderate; PTSD; and ADHD.  *Id.*  As to his functional abilities, she found that he was capable of understanding, remembering, and carrying out instructions at a level consistent with his intellectual functioning; may have mild impairment in his attention and concentration due to his depression and anxiety; was not limited in his social interactions; and had mild to moderate impairments in his stress tolerance due to depression and chronic anxiety.  (Tr. 407).

### 3.        Psychological Consultive Examiner – Gary J. Sipps, Ph.D.

On July 24, 2018, Gary Sipps, PhD, evaluated Brunton's mental health.  (Tr. 433-438).  Dr. Sipps noted that Brunton had an impaired gait and found that he was cooperative during the interview and had appropriate eye contact.  (Tr. 435).  He also found that Brunton had looseness of association in his conversation, and subdued affect and emotional agitation, but no overt signs of anxiety despite being very afraid of people.  *Id*.  Dr. Sipps found that Brunton had unremarkable thought content, was orientated during the appointment, and appeared to currently to be functioning in the low-average range of adult intellectual ability.  (Tr. 436).

Dr. Sipps diagnosed Brunton with unspecified affective disorder, PTSD, unspecified disorder of psychological development, unspecified behavioral syndromes associated with physiological disturbances and physical factors, and cannabis abuse.  *Id.*  He assessed that Brunton did not appear limited in his ability to understand instructions or to complete simple

15

tasks, but he did appear limited in his ability to maintain attention and concentration with appropriate persistence and pace in performing multistep tasks.  (Tr. 437).  Dr. Sipps also found that Brunton did not appear limited in responding appropriately to supervision and to coworkers in a work setting but did appear limited in his ability to respond appropriately to typical and expected work stressors.  (Tr. 437-438).

### 4.    Medical Source – Lisa Renier, LISW-S

On August 8, 2019, Renier completed a mental residual functional capacity questionnaire for Brunton.  (Tr. 441-445).  Based on their appointments from May 15, 2019 to August 8, 2019, Renier assessed that Brunton had major depressive disorder, unspecified trauma and stressors related to his disorder, and generalized anxiety disorder with panic attacks.  (Tr. 441).  She identified side effects of medication that "may have implications for working."  *Id.*

Renier also identified "*clinical findings* . . . that demonstrate the severity of your patient's mental impairment and symptoms."  *Id.*  She identified, among other things, that Brunton had tangential, vague thoughts; trouble focusing; rapid speech; sleep disturbances, crying spells; tightness in his chest; cold sweats; and a rapid heart rate.  *Id.*  He also was easily agitated, irritable, and social isolated.  *Id.*  Brunton exhibited signs of anhedonia or loss of interest, appetite disturbance, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, motor tension, and emotional liability, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of trauma, psychomotor agitation or retardation, inappropriate suspicions, emotional withdrawal or isolation, flight of ideas, manic syndrome, easy distractibility, sleep disturbance, decreased need for sleep when manic, recurrent severe panic attacks, and a history of multiple physical symptoms that have

caused him to take medicine frequently, see a physician often, and alter his life patterns significantly.  (Tr. 441-442).

Regarding his mental functioning, Renier found that Brunton had limited but satisfactory functioning in his ability to: (1) understand and remember very short and simple instructions; (2) carry out very short and simple instructions; (3) maintain regular attendance and be punctual with customary, usually strict tolerances; (4) ask a simple question or request assistance; and (5) be aware of normal hazards and take appropriate precautions.  (Tr. 443).  She found that he was "seriously limited but not precluded" in his ability to complete a normal workday and workweek without interruptions from his psychologically-based symptoms; respond appropriately to changes in a routine work setting; and deal with normal work stress.  *Id.*  She found that he also was "unable to meet competitive standards" in performing at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  *Id.*  She also noted that he had "significant issues" in maintaining attention for two-hour segments; and was either seriously limited or unable to meet competitive standards in his ability to work in coordination with a proximity to others without unduly distracting them.  *Id.*

Renier also said that Brunton's ability to understand and remember detailed instructions "depends if [he] fully concentrated/focused," and that his ability to set realistic goals or make plans independently of others "follow through may be impaired due to concentration, anxiety, focus."  (Tr. 444).  She also found that his ability to deal with stress of semi-skilled and skilled work was "seriously limited, but not precluded."  *Id.*  Brunton had limited but satisfactory ability to interact appropriately with the generally public and adhere to basic standards of neatness and

cleanliness. *Id.* He was seriously limited but not precluded in his ability to use public transportation and travel to unfamiliar places. *Id.* Renier found that Brunton did not have reduced intellectual functioning, and his anxiety, trauma, depression impacted his experience of pain or other physical symptoms. *Id.*

As to functional limitations, Renier found that Brunton had marked limitations in his restriction of activities in daily living; difficulties in maintaining social functioning; and moderate to marked limitations his difficulties in maintaining concentration, persistence, or pace, depending on his level of anxiety. (Tr. 444-445). She found that Brunton's impairments would cause him to be absent from work two to three times a week. (Tr. 445).

### 5. State Agency Consultants

On May 12, 2018, Elizabeth Das, MD, reviewed Brunton's physical limitations based on the medical evidence. (Tr. 98-101). She found that Brunton had the following functional limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk 2 hours; sit for 6 hours in an 8-hour day; limited pushing and/or pulling in his lower extremities based on his venous insufficiency and edema; occasionally climbing ramps/stairs; never climbing ladders, ropes, or scaffolds; frequently balancing; occasionally stooping; frequently kneeling; and frequently crouching. (Tr. 98-99). On July 31, 2018, Maria Congbalay, MD, found the same limitations, differing only in that Brunton could occasionally kneel, crouch, and crawl on reconsideration. (Tr. 133-135).

On May 9, 2018, Cynthia Waggoner, PsyD, reviewed Brunton's mental functional limitations based on the medical evidence. (Tr. 102-104). She found that Brunton did not have any understanding and memory limitations, but he did have concentration and persistence limitations. (Tr. 102). Specifically, Dr. Waggoner found that Brunton was moderately limited in

his ability to carry out detailed instructions and maintain his attention and concentration for
extended periods.  *Id.*  She also found that he was moderately limited in his ability to complete a
normal workday and workweek without interruptions from psychologically based symptoms and
to perform at a consistent pace.  *Id.*  Dr. Waggoner also found that Brunton had social
limitations, specifically that he was moderately limited in his ability to interact appropriately
with the general public and to accept instructions and respond appropriately to criticism from
supervisors.  (Tr. 103).  Brunton also had adaptation limitations in that he was moderately
limited in his ability to respond appropriately to changes in the work setting.  *Id.*  On August 15,
2018, Robyn Murry-Hoffman, PhD, found the same limitations on reconsideration.
(Tr. 135-137).

### D.     Relevant Testimonial Evidence

#### 1.     Brunton's Testimony

Brunton testified at the hearing.  (Tr. 61-80).  He lived with his wife and two children.
(Tr. 61).  He lived in a two-story house, but he never went upstairs.  (Tr. 62).  He could drive, but
he rarely did so and only to his doctor's appointments.  *Id.*  He had had a handicap placard for
about five years.  (Tr. 63).  He had previously worked for various companies as IT support,
working primarily from a desk, but in all the positions he noted that either his anxiety,
depression, or ADHD caused him problems.  (*See* Tr. 63-66).

Brunton stated that he could not work because he could not work at any fast-pace
environment or around people, and he did not see any jobs that fit what he could do with those
limitations.  (Tr. 70).  His limbs, mental issues, and trouble interacting with others made it
difficult.  *Id.*  If he tried to do the dishes, cook a meal, or other tasks around the house, he would
be tired the next two days.  (Tr. 70-71).  He had lost 136 pounds in the year and a half since his

alleged onset day.  (Tr. 72).  He explained that losing the weight did not really help his physical problems because he had osteoarthritis in his joints and his doctors did not want to do surgery on the arthritis or the cyst on his tibia because he would first need his ankle fused together and his doctor did not want to do that because he was young.  *Id*.

Brunton stated that whenever the pressure changed his leg would swell.  (Tr. 73).  Even sitting down with his leg up would cause his legs to "feel like [he had] fire running down them." (Tr. 74).  He spent most of the day on the couch with his legs up to help the swelling and in the fetal position so his hip would not hurt.  *Id.*  His right hip was affected by his left ankle and was causing his hip joint to not move in the socket correctly.  (Tr. 75).  If he is not careful how he laid on the couch, his hip could cause him trouble walking regularly.  *Id.*

Brunton stated that he had trouble interacting with others because he got nervous around people.  (Tr. 76).  He had difficulty in focusing and concentrating because of his ADHD, for example he would go to do the dishes and freeze, "like reverse OCD."  (Tr. 77).  He mentioned that he had been diagnosed with ADHD when he was 14 and he had been trying to rule out bipolar with PPBH.  (Tr. 77-78).  The ulcers in his legs had healed over but could be seen underneath the skin.  (Tr. 79).

## 2.  Vocational Expert's Testimony

In response to the ALJ's hypothetical, the VE identified that the hypothetical individual could work as an addresser, document preparer, and "touch-up screener, printed circuit board assembly."  (Tr. 84-85).  In discussing the limitations further, the VE identified instances in which he testified based on his professional opinion.  (*See e.g.,* Tr. 85).  He stated that, save for when he had indicated to the contrary, his testimony was not inconsistent with or reliant on information outside the Dictionary of Occupational Titles ("DOT").  (Tr. 88).

IV.     **Law & Analysis**

    A.     **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

    Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

I will address Brunton's claims in a different order that he presented them.

### B.      Step 3: Medical Listings

Brunton contends that the ALJ failed to properly evaluate his physical and psychological conditions under the medical listings individually and in combination. ECF Doc. 14 at 13-19. He argues that the ALJ erred in evaluating Listing 1.02A by (1) erroneously stating that the listing required Brunton to use two canes, two crutches or a walker, and (2) substantial evidence supported that he had problems with at least one major weight-bearing joint and could not walk effectively. ECF Doc. 14 at 13-14. Brunton also contends that the ALJ should have found that he met Listing 4.11 because of his lymphedema, skin condition, and evidence indicating he needed to elevate his legs. ECF Doc. 14 at 14-15. Further, Brunton argues that the medical evidence supports that he met the mental health listings and that his ability to do *some* daily activities did not constitute substantial evidence in support of the ALJ's decision. ECF Doc. 14 at 17-18. He contends that the ALJ failed to consider the combination of his physical and psychological impairments, including his pain, and failed to build a logical bridge for his findings. ECF Doc. 14 at 16-18, 20.[3] He argues that the ALJ gave only perfunctory analysis of

---

[3] To the extent Brunton asserts the ALJ's misevaluation of his pain as an error with regard to his subjective symptom complaints, he has waived any argument on the ground by failing to substantively address it, making only a passing reference to it. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived. If is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones").

the listings and failed to fully and fairly develop the record.  ECF Doc. 14 at 15-16.  The

Commissioner disagrees.  ECF Doc. 18 at 26-30.  Brunton reiterates his claims in reply.  ECF

Doc. 20 at 1-3.

At Step Three, a claimant has the burden to show that he has an impairment or

combination of impairments that meets or medically equals the criteria of an impairment listed in

20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001);

20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, he

is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e);

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647,

653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must

"actually evaluate the evidence, compare it to [the relevant listed impairment], and give an

explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of

Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is

impossible for a reviewing court to determine whether substantial evidence supported the

decision).  The ALJ "need not discuss listings that the [claimant] clearly does not meet,

especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of

SSA*, 544 F. App'x 639, 641 (6th Cir. 2013).  "If, however, the record raises a substantial

question as to whether the claimant could qualify as disabled under a listing, the ALJ should

discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ

erred by not conducting any Step Three evaluation of the claimant's physical impairments, when

the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

### 1. Medical Listing 1.02: Standard & Analysis

Brunton claims that the ALJ misconstrued Medical Listing 1.02A and erred in his analysis of whether Brunton's leg and ankle condition met that standard. Listing 1.02A defines who is disabled because of a major dysfunction in a joint. Brunton focuses on the condition of his leg and ankle; the pertinent part of the regulation provides:

> 1.02 Major dysfunction of a joint . . .: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., . . . ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b. . .

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.02  Brunton has not cited anything in the record demonstrating the existence of a gross anatomical deformity, but, instead, focuses his argument on his contention that he has "an inability to ambulate effectively," as evidenced by Dr. Junko's prescription of a cane. And Brunton argues that the ALJ was wrong to conclude that the

regulation required the use of two canes, two crutches or a walker in order for a claimant to meet

Listing 1.02A.  Because listing 1.02A plainly – as Brunton acknowledges – requires proof that

the claimant has "an inability to ambulate effectively as defined in 1.00B2b," we must focus on

that regulation.  In pertinent part it provides:

> (1) Definition. Inability to ambulate effectively means ***an extreme limitation of the ability to walk***; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation ***without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities***. . . .

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, ***examples*** of ineffective ambulation include, but are not limited to:
> - ***the inability to walk without the use of a walker, two crutches or two canes***,
> - the inability to walk a block at a reasonable pace on rough or uneven surfaces,
> - the inability to use standard public transportation,
> - the inability to carry out routine ambulatory activities, such as shopping and banking, and
> - the inability to climb a few steps at a reasonable pace with the use of a single hand rail.
>
> The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.00B2b (emphases and formatting changes added).

The ALJ summarized his finding regarding Listing 1.02A as follows:

> Mr. Brunton ambulates without an assistive device that compromises the use of both upper extremities, such as two canes, two crutches, or a walker, and thus the osteoarthritis of the left ankle and foot does not meet the severity criterion of Listing 1.02A for an "inability to ambulate effectively," as defined in section 1.00B2b of Appendix 1.

(Tr. 18).  In light of this language, we can see why Brunton would believe the ALJ required

evidence that Brunton had need to use two canes.  But that is an overly constricted reading of the

decision.  A fairer reading focuses on the ALJ's key finding: Mr. Brunton ambulates without an

assistive device that compromises the use of both upper extremities.  Although Brunton argues

that "even the use of one cane would affect the ability to use both hands while standing or

walking" (ECF Doc. 14 at 14), he has cited no record evidence that he has "an extreme limitation

of the ability to walk . . . without the use of a hand-held assistive device(s) that limits the

functioning of both upper extremities."  It was Brunton's burden to prove that he could meet this

standard; an unsupported assertion in his brief that "even the use of one cane would affect the

ability to use both hands while standing or walking" is not sufficient.

The ALJ complied with the regulations by actually evaluating the evidence, comparing

the limitations supported by the evidence with the requirements under Listing 1.02A and

explaining that the evidence did not show that, even with Brunton's acknowledges use of a cane,

the limitations on his ambulation was insufficiently severe. 20 C.F.R. pt. 404, Subpt. P, App. 1

§ 1.00B2b(1); (Tr. 18).  Further, in his later Step Four discussion of the RFC, the ALJ noted that

Brunton's leg swelling was improving; his pain medication was working; Dr. Junko noted

Brunton could walk unassisted, even with an impaired gait; Brunton managed his pain with CBD

oil; and numerous treatment notes indicated that, although Brunton had been prescribed a cane,

he did not rely on it.  (*See* Tr. 25-29).

Substantial evidence supports the ALJ's findings that Brunton did not meet Listing

1.02A.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Specifically, such evidence includes:

(1) treatment notes indicating that Brunton could walk without the cane, albeit sometimes with

an impaired gait, (Tr. 332, 393, 484, 523, 532); (2) his own statements that he could do yard

work for about two hours, mow the lawn for an hour or walk around his half-acre property

(Tr. 414, 473); (3) treatment notes indicated Brunton's ankle pain had substantially improved or

was not an active problem (Tr. 345, 414-416, 419, 523, 532); (4) treatment notes recommending

conservative treatment through increased activity and the use of compression socks (Tr. 448-449, 457); (5) the lack of any treatment notes identifying Brunton as depending on a cane; and (6) his wife's failure to mention the cane in her function report, even after it was prescribed (Tr. 297, 533). *Biestek*, 139 S. Ct. at 1154. Although evidence exists that demonstrates that Brunton's pain was not wholly eliminated, even if that evidence constituted a preponderance, a remand would not be warranted in light of the substantial evidence supporting the ALJ's finding. *O'Brien*, 819 F. App'x at 416. Even though the ALJ could have better described the requirements of Listing 1.02A, any failure on his part to more complete in his discussion does not undermine the substantial evidence supporting his conclusion, and the ALJ's finding as to Listing 1.02 must be affirmed.

### 2.      Medical Listing 4.11: Standard & Analysis

A claimant's chronic venous insufficiency of a lower extremity meets Medical Listing 4.11 if it is accompanied by an "incompetency or obstruction of the deep venous system," and one of the following:

> A. Extensive brawny edema [] involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip. OR
> B. Superficial varicosities, statis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 4.11.

The ALJ applied the proper legal standards and reached a determination supported by substantial evidence in finding that Brunton did not meet Listing 4.11. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. As with Listing 1.02A, the ALJ complied with the regulations by actually evaluating the evidence, comparing the limitations supported by the evidence with the requirements under Listing 4.11 and explaining that the evidence did not show that:

(1) Brunton's chronic venous insufficiency and lymphedema resulted in a sufficiently extensive brawny edema or (2) that any of the other conditions lasted sufficiently long as required under Listing 4.11. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 4.11; (Tr. 19). Moreover, the ALJ extensively detailed the severity of Brunton's chronic venous insufficiency and lymphedema and other conditions of his lower extremities in his Step Four explanation of Brunton's RFC. (*See* Tr. 25-29). There, the ALJ highlighted that by mid-March 2018, Brunton's wound had almost healed, he had no evidence of residual cellulitis on his leg; and by May and June 2018, Brunton's edema was much improved. (Tr. 25-26). Further, by August 2018, the ALJ noted that Brunton's edema had good reduction and, noted that the improvement continued into 2019 when Brunton reported that his edema had improved, his neuropathy was better, and he was walking around his half-acre yard. (Tr. 27-28). In identifying this evidence, the ALJ built a logical bridge between the evidence of Brunton's improved conditions and his finding that Brunton's lymphedema was not severe enough to meet Listing 4.11. *Fleischer*, 774 F. Supp. 2d at 877.

Substantial evidence also supports the ALJ's finding that Brunton did not met Listing 4.11. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Specifically, such evidence includes: (1) treatment notes in February and March 2018 reflecting that his leg wound was almost completely healed by mid-March (Tr. 330-336); (2) treatment notes indicating Brunton's edema had improved or was not even mentioned in treatment (Tr. 416, 460, 473, 477-480, 484-486, 522, 531); (3) Brunton's report that he was only taking mental health medication and using medical marijuana (Tr. 477); and (4) Dr. Junko's treatment notes indicating that with Brunton's improved health, including in his lymphedema, he could now be a candidate for surgical procedures (*See* Tr. 397, 525). *Biestek*, 139 S. Ct. at 1154. Because substantial evidence

supports the ALJ finding, it falls in his "zone of choice," within which the court may not second-guess his decision.  *Mullen*, 800 F.2d at 545.  And the ALJ's finding must be affirmed.

### 3.    Mental Health Limitations: Standard & Analysis

Medical Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety disorders), 12.11 (neurodevelopmental disorders), and 12.15 (trauma- and stressor-related disorders) provide the medical criteria for meeting listed mental health impairments.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.011, 12.15.  To meet these listings the claimant must show that he meets: (1) the impairment-specific medical criteria in Paragraph A; and (2) the functional limitations criteria in Paragraphs B or C.  *See id.*  To meet Paragraph B, the claimant must show that his condition resulted in an "extreme limitation of one or marked limitation of two, of the following areas of mental functioning: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; (4) adapt or manage oneself."  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.011, 12.15.  To meet the criteria for Paragraph C, a claimant must show that he had a:

> Medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder; and (2) marginal adjustment, that is, [the claimant has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life.

20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.011, 12.15.

The ALJ applied the proper legal standards and reached a determination supported by substantial evidence in finding that Brunton did not meet any of the listed mental health impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  First, it should be noted that Brunton has not challenged any specific mental health listing, but rather broadly asserts that the ALJ's

reliance on Brunton's daily activities was improper and, it appears, that his conclusions under Paragraph B were not supported by substantial evidence.  *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x at 432; ECF Doc. 14 at 17-18.  However, the ALJ's decision demonstrates that he methodically discussed the Paragraph B criteria, identifying under each subsection what Brunton's subjective statements on the issue were; what the clinical, medical, or other evidence existed on the issue; and why he found only moderate limitations for each category.  (*See* Tr. 19-22).

Substantial evidence supports the ALJ's finding that Brunton did not meet the Paragraph B criteria for any of the mental health listings considered.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Specifically as to his concentration, persistence, and pace, such evidence includes: (1) treatment notes that generally identified Brunton as having "fair" or "good" concentration and attention (Tr. 464-466, 468, 558, 579); and (2) Dr. Benson-Blankenship's finding that Brunton had only a mild impairment in his concentration and attention (Tr. 406-407).  As to understanding, retaining, and applying information, such evidence includes: (1) treatment notes, generally, indicating that Brunton had fair judgment and insight, and normal thought process and content (Tr. 464-466, 468, 550, 557-558, 569, 566, 578-579, 597, 601); and (2) consultive examiner notes that Brunton was not limited in his ability to understand, remember, and apply simple instructions (Tr. 405-407, 437, 443).

As to Brunton's ability to socially interact with others, such evidence includes: (1) treatment notes generally indicating that Brunton was cooperative, maintained appropriate eye contact, had speech that was coherent or within normal limits, and/or he was appropriate in affect (Tr. 464-466, 468, 550, 557-558, 563, 566, 569, 578-579, 597, 601); (2) Lisa Brunton's opinion that Brunton would talk to family and friends, did not have trouble with authority, and

had not been laid off because of trouble working with others.  (Tr. 296-297); (3) consultive examination notes that Brunton was not limited in his social interactions (Tr. 407, 437-438); (4) Brunton's own reported interaction with others (Tr. 406).  And, as to his ability to adapt and manage himself, such evidence includes: (1) treatment notes generally indicating that his mood was euthymic, stable, or appropriate (Tr. 464-466, 468, 597); and (2) Dr. Sipps' evaluation that Brunton was at most only mild to moderately impaired in his adaptation (Tr. 407, 437-438). *Biestek*, 139 S. Ct. at 1154.

Brunton contends that the ALJ's reference to his daily activities with regard to his mental functioning did not constitute substantial evidence to support the listings analysis.  This argument fails because: (1) Brunton's citation to *Loman v. Comm'r*, 107 F. Supp.3d 829, 838 (S.D. Ohio May 8, 2015) is out of context (as it related to the ALJ's overall RFC finding rather than the medical listings); and (2) even assuming *Loman*'s reasoning was applicable, the ALJ relied on far more than just Brunton's daily activities in determining he did not meet the listings, as discussed above.

Additionally, Brunton contends that the ALJ failed to account for his pain and that the combination of his impairments equaled a medical listing.  ECF Doc. 14 at 16-17, 20.  However, the ALJ referenced his obligation to consider the combination of his impairment and carefully examined the impairments individually.  (Tr. 18).  And the discussion of both his obligation and the individual impairments – alone – does not necessitate a finding that the ALJ failed to consider the combination of impairments.  *See Loy v. Sec'y of Health and Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990) ("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet

31

the listings." (internal quotation marks omitted)).  The ALJ is not required to provide an entirely separate discussion of whether the combination of impairments medically equaled the listings; he is merely required to consider the issue.  Here, he said he did, and his exhaustive 35-page decision gives us good reason to conclude that to be true.  As a result, the ALJ's Step Three conclusions regarding the listed impairments was supported by substantial evidence and fell within his "zone of choice." *Mullen*, 800 F.2d at 545.  I recommend Brunton's claims to the contrary be overruled and the ALJ's Step Three findings be affirmed.

### C.     Step Four: Assistive Device Limitation

Brunton contends that the ALJ erred by failing to include a limitation in his RFC for the use of an assistive device despite Brunton having been prescribed a cane.  ECF Doc. 14 at 23. The Commissioner does not specifically address this argument.  *See generally* ECF Doc. 18. Brunton does not address it in reply.  *See generally* ECF Doc. 20.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

32

Generally, for an assistive device to be considered a restriction or limitation, there must be sufficient evidence in the record to obligate the ALJ to conclude that the device is "medically necessary," based on a showing that it is "more than just a subjective desire on the part of the plaintiff" to use it. *See Murphy v. Astrue*, No. 2:11-CV-00114, 2013 U.S. Dist. LEXIS 30492, at *28 (M.D. Tenn. March 6, 2013) (internal citations omitted).  Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is error when the claimant has been prescribed an assistive device but the ALJ did not include the use of the device in the RFC finding, and did not explain the omission. *Cruz-Ridolfi v. Comm'r of Soc. Sec.,* No. 1:17-CV-1075, 2018 U.S. Dist. LEXIS 32651, at *43 (N.D. Ohio Feb. 12, 2018).  However, for an ALJ to find an assistive device medically necessary, there must be medical documentation establishing the need for the device to aid in walking or standing, and documentation "describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distances and terrain; and any other relevant information)."  SSR 96-9p, 1996 SSR LEXIS 6, at *20.

The ALJ applied the proper legal standards and reached a determination supported by substantial evidence in not including a specific limitation for an assistive device in his RFC findings.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ acknowledged that Dr. Junko prescribed a cane for Brunton's assistance while walking.  (Tr. at 28-29).  Although the actual prescription and more detail of Dr. Junko's recommended use of the cane were not given, even if all the requirements for an assistive device under SSR 96-9p were met, the ALJ adequately explained that Brunton's conduct undermined any finding that the cane was a "medical necessity," pointing to the lack of any reference to a cane in the majority of his 2018 medical records.  SSR 96-9p, 1996 SSR LEXIS 6, at *20; *Cruz-Ridolfi, 2018 U.S. Dist. LEXIS 32651,*

at *43; (Tr. 27).  Further, as noted above with regard to Listing 1.02A, substantial evidence

supports Brunton's ability to walk without the use of a cane, rending it not a medical necessity.

*Biestek*, 139 S. Ct. at 1154; (*see* Tr. 332, 393, 414, 473, 484, 523, 532).

### D.     Step Four: Opinion Evidence

Brunton contends that the ALJ erred in the weighing of his wife's and Social Worker

Renier's opinions and "cherry picked" the evidence.  ECF Doc. 14 at 20-23.  He argues that the

ALJ's findings were inconsistent with Renier's treatment notes.  ECF Doc. 14 at 22-23.  As to

his wife, Brunton asserts that the ALJ's decision to find that his wife's function report

"overstated" Brunton's limitations was not adequately explained and did not comply with the

requirements of SSR 16-3p.  ECF Doc.14 at 20-21.  The Commissioner disagrees as to Lisa

Brunton's opinion but does not address Renier's assessment.  *See* ECF Doc. 18 at 30-32.

Brunton replies that the Commissioner failed to address the weighing of Renier's opinion and

reiterates his arguments.  ECF Doc. 20 at 3-4.

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after

considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e).  In doing

so, the ALJ is required to "articulate how she considered the medical opinions and prior

administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must

explain how he considered the supportability and consistency of a source's medical opinion(s),

but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).[4]  According

to the regulation, the more consistent a medical opinion is with the evidence from other medical

and nonmedical sources, the more persuasive the medical opinion will be.  This is the

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

> Under SSR 16-3p:
>
> Other sources may provide information from which we may draw inferences and conclusions about an individual's statements that would be helpful to us in assessing the intensity, persistence, and limiting effects of symptoms. Examples of such sources include . . . non-medical sources such as family and friends. . . . The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as all of the evidence on file.

SSR 16-3p, 2016 SSR LEXIS 4, at *17-18.

An ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and explain why he chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer*, 774 F. Supp. 2d at 881 (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

### 1.    Social Worker Lisa Renier's Mental Health Assessment

The ALJ applied the proper procedures and reached a determination supported by substantial evidence in evaluating Renier's opinion.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Specifically, the ALJ properly evaluated the consistency and supportability of her opinion, as required by the regulations, and explicitly stated that her opinion was "not persuasive for a host of reasons."  (Tr. 40).  Regarding supportability, the ALJ specifically noted that

Renier's opinion was "unpersuasive" because: (1) in support of her functional assessment, she proffered symptoms inconsistent with the diagnoses in her own treatment notes; (2) she failed to address improvement identified in her own notes; (3) she failed to acknowledge or address Brunton's reportedly intact daily activities or his successful trip to Wisconsin; and (4) she identified side-effects that no counseling note or other medical record noted Brunton complaining of.  (Tr. 40).  From these inconsistencies within Renier's own evaluations and treatment notes, the ALJ reasonably concluded that Renier's functional assessment was not well supported.  20 C.F.R. § 404.1520c(c)(1); (Tr. 40-41).

It does appear that the ALJ may have misread or construed the side-effects noted by Renier differently than she did; the form Renier completed asked for the "side effects of medication that may have implications for working."  It did not indicate that the patient must have experienced those effects.  (*See* Tr. 441).  Regardless, the ALJ's notation of several other grounds undermining the supportability of Renier's opinion would render any potential error concerning medication side effects harmless.  *See Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." (citations omitted)).

As to consistency, the ALJ noted that Renier's assessment was: (1) inconsistent with her own treatment notes that identified improvement and stabilization in Brunton's symptoms and with his daily activities; and (2) the consultive examiners' evaluations from May 2018 and July 2018.  (Tr. 41).  Moreover, several of the ALJ's "supportability" points also applied to the consistency of her opinion, including, Renier's failure to address Brunton's daily activities.

(Tr. 40-41).  With these inconsistencies in mind, substantial evidence supported the ALJ's conclusion that Renier's functional assessment was unpersuasive.  20 C.F.R. § 404.1520c(c)(2).

Substantial evidence supports the ALJ's finding that Renier's opinion was unpersuasive. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Specifically, such evidence includes: (1) treatment notes indicating that Brunton's symptoms were generally related to depression and anxiety (Tr. 462-467, 544-546, 563, 566, 569, 572, 577-578, 598-599, 601); (2) Brunton's reports to her that the medication was helping; and she did not find a decline in his mental status, noting that there were "no significant changes," (Tr. 566, 569, 572, 597-599); and (3) no other psychological treatment notes and Brunton's own reports indicated that he experienced side-effects, such as crying spells, cold sweats, or a rapid heart rate (*Compare* Tr. 441 *with* Tr. 462-467, 544-546, 563, 566, 569, 572, 577-578, 598-599, 601).  Further, both Drs. Benson-Blankenship and Sipps found that, although Brunton had limitations, he was not as limited as Renier identified (Tr. 407, 437-438).  *Biestek*, 139 S. Ct. at 1154.

Brunton asserts that the ALJ "cherry-picked" evidence to support his non-disability finding, citing three of Renier's treatment notes identifying that Brunton was angry, had increased anxiety at night, started but struggled to finish projects, and had spells of depression. ECF Doc. 14 at 23.  Brunton asserts that these notes "contradict the ALJ's rationale" for discounting Renier's opinion.  I disagree.  The ALJ expressly identified that he discounted Renier's opinion for the reasons noted above – none of which is contradicted by Brunton having or still experiencing anxiety, anger, issues following through, or depression.  *Rogers*, 2018 U.S. Dist. LEXIS 68715 *44.

Because the ALJ's finding was supported by substantial evidence, his weighing of Renier's assessment fell within his "zone of choice" and cannot be second-guessed.  *O'Brien*, 819 F. App'x at 416.  The ALJ's decision on this issue must be affirmed.

### 2.    Lisa Brunton's Function Report

As to Lisa Brunton's evaluation, the ALJ likewise applied proper legal standards and made a determination supported by substantial evidence in finding her evaluation only "partially consistent."  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ identified his obligation to consider Ms. Brunton's evaluation under SSR 16-3p, noting it in the heading and in articulating the standards for determining Brunton's RFC.  (Tr. 23, 34).  Moreover, the ALJ properly applied this standard by comparing the consistency of Ms. Brunton's opinion with Brunton's own statements and the record evidence.  2016 SSR LEXIS 4, at *17-18.  Although the ALJ did not specifically outline conflicts between Ms. Brunton's evaluation and the evidence in this section of his decision, in the preceding paragraph, the ALJ summarized Ms. Brunton's assessment. Reading the decision as a whole and with common sense, the ALJ articulated conflicts arising from: (1) Brunton's improved peripheral vascular disease and decreasing weight, (2) Brunton's own statements reporting improvement in his mental health, (3) conservative treatment of his leg pain and swelling, and (4) Brunton's travel to Wisconsin.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense"); (Tr. 34-35).

The ALJ also found that Ms. Brunton's report was inconsistent with the medical evidence because she reported mood swings between mania and depression that the medical evidence did not mention.  (Tr. 35).  However, the medical evidence did indicate Brunton reported experiencing mood changes.  (*See* Tr. 544, 566).  Although the ALJ overstated the lack of

support for that one aspect of Ms. Brunton's report, the other findings, as discussed below, are supported by substantial evidence; thus, rendering any error in this regard harmless.  *Fisher, 869 F.2d at 1057.*  As a result, the ALJ built a logical bridge between his assessment of Ms. Brunton's function report and the other record evidence, finding that her report was only partially consistent.  *Fleischer*, 774 F. Supp. 2d at 877.

Substantial evidence also supports the ALJ's finding.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Such evidence includes: (1) treatment notes indicating Brunton's edema had improved or was not even mentioned in treatment (Tr. 416, 448, 456-457, 460, 473, 477-480, 484-486, 522, 531); (2) Brunton's reported statements that his mental health medication was helping (Tr. 464-465, 468); (3) treatment notes recommending conservative treatment through increased activity and the use of compression socks (Tr. 448-449, 457); and (4) Brunton's travel to Wisconsin two months prior to his wife's report that he could not (Tr. 291, 298, 598).  *Biestek*, 139 S. Ct. at 1154.

Brunton contends that the ALJ "cherry picked" evidence to undermine Ms. Brunton's report and support his non-disabled finding, largely citing portions of his own testimony, and appears to attack the ALJ's RFC finding as a whole.  *See* ECF Doc. 14 at 20.  However, Brunton has not identified any limitations that the ALJ did not address or overlooked.  Rather – Brunton's argument rests on his wife's function report being supported by his own testimony.  In other words, Brunton's "cherry picking" argument essentially amounts to nothing more than a request for the court to re-weigh record evidence, which we cannot do.  *Chicora v. Comm'r of Soc. Sec.*, No. 20-1827, 2021 U.S. App. LEXIS 12064, at *9-10 (6th Cir. 2021) (*citing DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014).  Accordingly, the ALJ's decision to discount Lisa Brunton's function report should be affirmed.

### E.    Step Five: Vocational Expert Testimony

Brunton contends that VE never testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and, thus, the ALJ could not rely on the testimony. ECF Doc. 14 at 24.  The Commissioner does not address this issue.  *See generally* ECF Doc. 18. In reply, Brunton contends that the ALJ additionally erred because the VE testified that the need to elevate one's legs during the workday constituted an accommodation.  ECF Doc. 20 at 3.

An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a VE's testimony that the claimant has the ability to perform specific jobs.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002).  A VE's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  Under the regulations, the ALJ must inquire whether the VE's testimony is consistent with the DOT.  U.S. Social Security Administration § DI 25015.030.

Here, Brunton's argument fails because the ALJ did inquire as to the consistency of the VE's testimony with the DOT.  (Tr. 88).  Moreover, Brunton has waived his contentions regarding the VE's testimony on an individual's need to elevate his legs by raising them for the first time in reply.  *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010) (affirming a district court's finding that a claimant waived arguments that he did not raise in his

merits brief).  Accordingly, no legal error occurred and the ALJ could rely on the testimony as substantial evidence.

### F.       Separation of Powers Argument

Brunton contends that remand is required due to the Commissioner's unconstitutional exercise of authority.  ECF Doc. 14 at 10-11.  He argues that the SSA and the Consumer Financial Protections Bureau ("CFPB") have the same structure for the removal of their directors; thus, the Supreme Court's ruling in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020) – which found the statute for the CFPB director's removal violated the principle of separation of powers – applies to the SSA.  ECF Doc. 14 at 10. According to Brunton, because the ALJ operated under authority delegated to him by the Commissioner, who in turn was unconstitutionally exercising his authority, Brunton was "deprived [] of a valid administrative process."  ECF Doc. 14 at 10-11.  Brunton argues that his application was further harmed as it was made under regulations promulgated by the Commissioner, who lacked the lawful authority to do so.  ECF Doc. 14 at 11.  Brunton contends that the separation of powers violation resulted in a "presumptively inaccurate legal standard" being utilized to decide his application.  ECF Doc. 14 at 11.

The Commissioner concedes that the removal provisions governing the SSA Commissioner's office violated separation of power principles but contends that the constitutional error is harmless because the violation did not cause Brunton any actual harm. ECF Doc. 18 at 13-14.  Relying on *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the Commissioner argues that the violation did not harm Brunton because the ALJ's appointment was ratified by an acting Commissioner not subject to the removal provision at issue and, thus, the removal issue did not void the ALJ's actions.  ECF Doc. 18 at 15-17.  Further, the Commissioner argues that

41

Brunton failed to establish a nexus between the removal provision and any harm he suffered; and he asserts, as in *Collins*, the unlawfulness of a removal provision did not strip those appointed of their authority.  ECF Doc. 18 at 18-20.  Moreover, the Commissioner argues that the separation of powers violation was harmless based on the harmless error doctrine, the *de facto* officer doctrine, the Rule of Necessity, and prudential considerations.  ECF Doc. 18 at 21-26.

Brunton replies that the court need not reach the constitutional issue as there are other grounds for remand but that he did demonstrate an injury from the Commissioner's conduct.  ECF Doc. 20 at 1, 4-5.  Specifically, he argues that he was injured from: (1) the Commissioner's changes to HALLEX regarding how decisions were written; (2) changes to the policies regarding the evaluation of musculoskeletal impairments; and (3) the deprivation of a constitutionally valid, hearing, adjudication, and decision.  ECF Doc. 20 at 5-6.  He also asserted that, because the Commissioner did not contest his standing, he "had standing to raise this issue."  ECF Doc. 20 at 4.  Further, he argues that the doctrines the Commissioner cited to support the violation's harmlessness did not apply.  ECF Doc. 20 at 6-8.

In *Collins*, the Supreme Court reviewed the constitutionality of the Federal Housing Financial Agency's removal structure for its directors, which prohibited the president from removing the directors except "for cause."  141 S. Ct. at 1783.  The Court held that the limitation on the president's removal authority over a federal executive branch agency director violated the separation of powers.  *Id.* at 1783.  In doing so, the Supreme Court relied on its prior precedent in *Seila Law*.  *Id.*  In *Seila Law*, the Court held that the CFPB removal structure, which limited the removal of the CFPB Director by the president only to instances of "inefficiency, neglect of duty, or malfeasance of office," violated the separation of powers between Congress and the Executive Branch.  *Id.* at 2197.

42

Before we address the merits of Brunton's constitutional argument, the court has an obligation to ensure it has jurisdiction.  *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Regardless of whether the parties raise or have disclaimed the issue, the court must ensure the parties have standing to raise the issue.  *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019) ("One essential aspect of this [jurisdiction] requirement is that any person invoking the power of a federal court must demonstrate standing to do so" (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)).

The standing requirement enforces the Constitution's limitation that the Judicial Branch may only decide "Cases" and "Controversies."  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992).  To demonstrate standing, a plaintiff must show that he has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision."  *Id.* at 560-561 (internal alterations removed).

I find that Brunton has failed to establish an "injury in fact" arising from the Commissioner's work while he was subject to an allegedly unconstitutional removal statute.  An "injury in fact" must be more than an abstract asserted harm, but must be an "invasion of a legally protected interest" that is: (1) concrete; (2) particularized; and (3) actual or imminent. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).  Brunton initially asserts only that the alleged separation of powers issue contaminated the administrative process by which a decision was reached on his claim and that a "presumptively inaccurate" legal standard was used.  However, he cites no authority for his presumption.  In his reply, Brunton attempts to bolster his asserted injury by contending that the Commissioner's policy changes on how ALJ decisions were written and the modification of the musculoskeletal listing of impairments harmed him.

43

But Brunton's contentions fail in one significant way – he never argues that these issues affected the decision on *his* claim. Brunton bases his argument that he was deprived of a valid administrative process on the separation of powers issue. *See* ECF Doc. 14 at 10-11. He never demonstrates that *because* the separation of powers violation the ALJ in his case applied a legal standard the president might have disagreed with, or that a different Commissioner might have altered. And Brunton's other claimed harms are similarly flawed. He makes no argument that the changes in the musculoskeletal listing somehow adversely affected his ability to prove his disability or that the changes in how ALJ decisions were written created a due process issue.

Absent some argument on a personal connection between those changes and the decision on his claim, Brunton asks this court to base its jurisdiction on a generalized grievance. And this has long been insufficient to constitute a "Case" or "Controversy." *See Lujan*, 504 U.S. at 560 n.1 (holding that for an injury to be "particularized" the complained of conduct must have affected the plaintiff "in a personal and individual way"); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (holding that harm which affected the plaintiff and every citizen's interest in the proper application of the constitution and laws, and relief that did not tangibly benefit him more than other citizens was not a case or controversy).

Because Brunton has not alleged a particularized injury stemming from the asserted separation of powers violation, he has failed to meet his burden of establishing standing. *Va. House of Delegates*, 139 S. Ct. at 1950. And the court must not, therefore, consider the merits of his constitutional challenge to the SSA.

## V. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Brunton's

applications for DIB and SSI be affirmed.  I further recommend that the Court conclude that

Brunton lacks standing to pursue the constitutional violation he asserts.


Dated: December 9, 2021

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  *See
U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985),
*reh'g denied*, 474 U.S. 1111 (1986).